Florence Wattles HARTZ et al., Plaintiffs-Appellants-Cross-Appellees,

v.

UNITED STATES of America, Defendant-Appellee-Cross-Appellant.

No. 26923.

United States Court of Appeals
Fifth Circuit.

Sept. 11, 1969.

Glover McGhee, Albert E. Phillips, Atlanta, Ga., George E. Morrow, Memphis, Tenn., Swift, Currie, McGhee & Hiers, Atlanta, Ga., Martin, Tate & Morrow, Memphis, Tenn., for appellant and cross-appellee Florence Wattles Hartz.

Charles L. Goodson, U. S. Atty., Atlanta, Ga., William D. Ruckelshaus, Asst. Atty. Gen., John C. Eldridge, Reed Johnston, Jr., Robert V. Zener, Attys., Civil Division, Appellate Section, Dept. of Justice, Washington, D. C., for the United States.

Before TUTTLE and GEWIN, Circuit Judges, and COMISKEY, District Judge.

TUTTLE, Circuit Judge:

This is the second appearance of this federal tort claim case here. In our first decision, 5 Cir., 1968, 387 F.2d 870, we reversed the judgment of the trial court dismissing the suit because of that court's finding that the sole proximate cause of appellant-decedent's death was his negligence in taking off from the Atlanta airport shortly behind a large jet aircraft whose wing tip vortex, as agreed by all parties, caused his small plane to crash. In the crash William B. Hartz and his passenger, Harold S. Roth, were killed.

The reversal of the first judgment was based on our determination that the conduct of the controller in the Tower at the airport, at the time of Hartz's take-off was negligent and a proximate cause of the crash.[1] We also held that none of the other matters raised on the appeal needed consideration in light of our finding of a causal connection between the Tower's negligence and the crash.[2]

Upon remand, the trial court took testimony as to damages to be awarded to Mrs. Hartz, and to the survivors of the passenger Roth.

The trial court found the value of the decedent pilot's life[3] to be $600,000, which, by virtue of the comparative negligence statute of Georgia, the Court reduced by 25%; the court found the defendant's negligence was the greater, but that the decedent's negligence contributed 25% to the accident. This resulted in a final judgment of $450,000 in favor of plaintiff-appellant, Mrs. Hartz.

The court awarded Mrs. Roth a judgment for $300,000, which, of course, rep-

1. In that opinion we said:
"Two facts are well established. One, the controller cleared the Bonanza for take-off with the following warning:
'November 96 Delta cleared for take-off, watch the prop-wash.'
Two, the Bonanza crashed on take-off after it came into contact with the trailing vortex which was shed by the right wing of the DC–7.
"Obviously, the controller knew that he was clearing the Bonanza for a take-off into possible danger from turbulence created by the DC–7, a turbulence which may have included wing tip vortex. A warning was required, one that would meet the requirements of the manual. The manual, which was cited by the government to show the pilot's responsibility, provides the precise phraseology which shall be employed by the controller when communicating with a pilot who is about to take off. If the controller in the instant case had followed his manual, he would have warned the pilot of the Bonanza as follows: 'CAUTION, TUR-

BULENCE, DEPARTING EASTERN DC–7.' Instead, the caution which the controller gave to Hart was 'watch the prop-wash.' Testimony at the trial revealed that prop-wash and wing tip vortex are not one and the same. Prop-wash is less severe; it takes less time to dissipate. Stated differently, vortex is a more hazadous form of turbulence. The controller's use of the term 'prop-wash' may have misled Hartz to believe that he would encounter a minimal wind force which would not endanger his aircraft."

2. In this connection we said: "Our disposition of the foregoing issues makes it unnecessary to consider appellant's other contentions upon this appeal."

3. This is the measure of damages under the Georgia statute, Ga.Code Section 105–1302 states: "A widow, or, if no widow, a child or children, minor or sui juris, may recover for the homicide of the husband or parent, the full value of the life of the decedent, as shown by the evidence."

resented no diminution in the value of her husband's life, since the negligence of Hartz could not be attributed to him. No appeal is taken in the Roth case.

The Globe Indemnity Company had insured the Bonanza aircraft. It had paid to Hartz's partnership the sum of $17,000 on the agreed amount of the loss. The trial court charged Hartz's negligence to Globe by reason of the privity of Globe with Hartz. See Georgia Code Section 105–205, and Miller, Trustee, v. Smythe, 95 Ga. 288, 22 S.E. 532. The judgment in favor of Globe, therefore, was reduced proportionately.

Mrs. Hartz complains here on several grounds. First, she says that our previous decision, finding the Tower's conduct a proximate cause of the crash, when coupled with our statement that this, in effect, disposed of the liability features of the case,[4] foreclosed any further determination by the trial court assigning part of the responsibility for the crash to the decedent. Second, plaintiff-appellant asserts that the basic findings of the trial court, based on undisputed testimony, that Mr. Hartz's income had been in recent years in excess of $65,000 per year, and that he had a life expectancy of 29 years, mathematically precluded a final determination that his life had a value of no more than $600,000. Plaintiff asks that this court accept the basic findings as reflecting present earnings, but increase his prospective earnings and recompute the damages and enter a final judgment for $1,829,778; in the alternative she asks that we accept the $65,000 figure and mathematically apply the proper formula and enter judgment for some $1,300,000.

Globe asks that its judgment be revised upwards to represent its full loss without any reduction for negligence imputed to Hartz.

The United States cross appeals on the grounds, as asserted by it, that under the provisions of the Georgia statutes[5] it was error for the trial court to allow any recovery. This is because it is claimed that Hartz's negligence, although less than the government's, occurred at a time and under circumstances that make it clear that Hartz, according to the government's contention, could have "avoided the consequences to himself caused by the defendant's negligence."

The facts are fully set out in the prior decision of this court (see 387 F.2d 870), and they need not be fully repeated here. See also the findings and conclusions of law of the trial court upon the first hearing, Northern Dist. of Ga., 249 F.Supp. 119. Much abbreviated, the facts present the following picture.

Hartz was an experienced pilot whose partnership owned a Beechcraft Bonanza airplane. Hartz, with an employee, Roth, as a passenger, crashed on a takeoff from the Atlanta Municipal Airport on the evening of November 10, 1961. About 7:00 o'clock on this evening, after dark, an Eastern Airlines DC–7 was awaiting clearance to take off from runway 27 at the airport. It was positioned upon the east end of the runway which is 7860 feet long and runs in an east-west direction. While the DC–7 was there awaiting clearance for takeoff, Hartz radioed the airport control tower seeking permission for the Bonanza to take off upon runway 27 from an intersecting approach approximately 2160 feet west of the east end of said runway. Acting upon instructions from the Tower, the Bonanza taxied to a point where said approach intersects runway 27 and then stopped at the entrance to runway 27 for further instructions for takeoff. The DC–7 began its run down runway 27 and passed in front of the Bonanza. It became airborne 25 to 30

4. See footnotes 1 and 2, supra.

5. Georgia Code Ann. 105–603, provides: "Diligence of plaintiff.—If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. In other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained."

seconds after it started down the runway, at a point some 2500 to 3000 feet west of the east end thereof. The speed of the DC–7 over the ground at the point where it became airborne was approximately 115 knots per hour. Within 5 seconds thereafter its air speed was between 130 and 140 knots. This air speed was maintained until it passed over the west end of runway 27, at which time it was at an altitude of between 100 and 300 feet.

About 30 seconds after the DC–7 acknowledged by radio its clearance for takeoff, the controller instructed the Bonanza to move into a takeoff position upon runway 27 and then hold. Immediately after the Bonanza was positioned on runway 27, the controller cleared it for takeoff, at which time the controller gave Hartz the following warning. "November 96 Delta cleared for takeoff. Watch the prop wash." The Bonanza then began to move down the runway and became airborne. Moments later, while the Bonanaza was still airborne over runway 27, it encountered violent turbulence and was thereby thrown into an inverted attitude, whereupon it crashed, killing the pilot and his passenger. The turbulence which the Bonanza encountered was a trailing vortex which was shed by the right wing of the departing DC–7. This phenomenon is known as wing tip vortex.

The procedures to be followed by an airport controller are set forth in an operations manual which is provided by the Federal Aviation Agency. This manual is designated as The Air Traffic Control Procedures Manual (ATM–2–A). A copy thereof was received in evidence and was relied upon by the trial court in resolving liability. Among other things the Manual provides the precise phraseology to be employed in warning a departing pilot of possible danger from wing tip vortex.[6]

It is undisputed that Hartz was an experienced pilot having had more than 2000 hours of flying time, and that he had available to him manuals and other documents which described and cautioned against the dangers of wing tip vortices.

As we have indicated, the trial court found that the crash was attributable to Hartz's negligence in taking off under the circumstances here described. We concluded that the Tower was negligent in its conduct in giving the clearance under the circumstances as it did, and in not following the precise phraseology prescribed in the manual when it was apparent that wing tip vortex would be a dangerous factor in the takeoff of such a plane as that being flown by Hartz. (See footnote 6).

■ We consider first Mrs. Hartz's contention that, upon remand, there remained nothing for the trial court to do other than to assess damages. This requires an interpretation of our prior opinion in light of the issues raised by that appeal. We conclude that, as we construe the opinion as a whole, it was intended to put to rest finally the question of liability and fault, as well as causation. Viewing the carefully chosen language of that opinion, it is clear that this court determined the combination of actions by the Tower, i. e., the giving of clearance to takeoff immediately in the wake of a large jet aircraft, when the controller, from his position of observation, had the "duty to direct and guide the Bonanza in a manner consistent with its safety," 387 F.2d 870, 873, and the failure to use the prescribed cautionary phraseology, placed the entire responsibility for the crash on the controller, especially when this court found it "unnecessary to consider appellant's

---

6. This is stated as follows: "437-Phraseology. Phraseology shall be employed as set forth below. * * * 439.12—To issue takeoff clearance: Cleared for takeoff. 439.18—To issue cautionary information regarding possible rotary craft downwash, thrust stream turbulence, and/or wing tip vortices: CAUTION. TURBULENCE (Traffic Information). Example, CAUTION, TURBULENCE, DEPARTING AMERICAN ELECTRA."

other contentions," (including Hartz's negligence) raised on the appeal.

We conclude, therefore, that it was error for the trial court to apply the Georgia Comparative Negligence Statute to the case upon remand.

This, of course, disposes of the cross appeal of the United States, and leads us into a consideration of the question of damages.

The appeal by Mrs. Hartz strongly urges that having found that "Hartz's earnings for a number of years preceding his death were in excess of $65,000 per annum," [7] and that "the record indicates the business of Markwell and Hartz, Contractors (a partnership), was increasing annually and it is clear that Hartz's peak earning capacity had not been achieved," it would be mathematically impossible for the sum of $600,000 adequately to represent the value of Mr. Hartz's life. Appellant also claims that the annual earnings figure of $65,000 has been proven by subsequent events, to be too small.[8]

In view of the many factors which are to be considered by the trier of the facts in arriving at a fair determination of the value of the life of a decedent in a death case in Georgia, see Pollard v. Boatwright, 57 Ga.App. 565, 196 S.E. 215,[9] we conclude that the $65,000 figure was intended by the trial court to be merely a basic figure to which the court then applied such modifying factors as it considered appropriate. The court did not say that Mr. Hartz would continue to earn at least $65,000 a year for each year of his expectancy. Under the Georgia rule the court was required to have recognized that Mr. Hartz's business may have its good years and its bad years; that there was no assurance that Mr. Hartz would continue in the same business throughout his life, and also that, in his declining years, he might, either voluntarily or involuntarily, suffer substantial reductions in the amount

7. The figure of $65,000 seems in fact a little higher than the sum arrived at by averaging the year's income immediately preceding death. The correct figure appears to be closer to $62,500. This indicates that the trial court was arriving at a figure which took into consideration his other finding that Mr. Hartz had not reached the peak of his earning power. In any event, the government accepts the $65,000 figure as not now assailable.

8. The partnership appears to have earned more for the succeeding two to three years during which it was completing jobs in process at Mr. Hartz's death. His share of this income was paid over to his estate. It is not clear from the record the circumstances which caused these payments to be made. Also, the record discloses that the *earnings* of the partnership were not all *paid out currently to the partners*. (That is to say, the earnings, which the trial court averaged at a figure in excess of $60,000). It is not clear from the record what duplication, if any, there is in the payments made to the estate and the earnings of the partnership, but not distributed before his death.

9. "The term 'full value of the life of the decedent' is construed to mean the gross

sum that the deceased would have earned to the end of his life, had he not been killed, reduced to its present cash value. The law fixes the basis of the jury's calculation, but does not prescribe any Procrustean method by which the damage must be arrived at. Central of Georgia Railway Co. v. Minor, 2 Ga.App. 804, 59 S.E. 81. In arriving at the amount of damages, the jury should consider the age of the deceased at the time of his death, his health, his habits, the amount of money he was earning, his expectation of life, the probable loss of employment, voluntary abstinence from work, dullness in business, reduction of wages, the increasing infirmities of age, with a corresponding diminution of earning capacity, and other causes which may contribute to the illustration of the gross earnings of a lifetime," citing Western & A RR Co. v. Moore, 94 Ga. 457, 20 S.E. 640; Fla.Central and Peninsula RR Co. v. Burney, 98 Ga. 1, 26 S.E. 730; Ala. Great So. R. R. Co. v. Brown, 138 Ga. 328, 75 S.E. 330; Central of Ga. Rwy. v. Ray, 129 Ga. 349, 58 S.E. 844; Central of Ga. Rwy. v. Anderson, 43 Ga. App. 189, 158 S.E. 333, 57 Ga.App. 565, 196 S.E. 215, 218.

of his earnings. The court also should properly have disregarded the income earned by his partially owned corporation except to the extent that he received a salary from it, for the stock in the corporation was not lost by his death, but became a part of his estate.

The principal disputes between the plaintiff and the United States on the damages, however, are of two kinds, (1) Is the figure representing the full value of Hartz's life to be reduced by a figure representing an estimate of the part that he would have expended on his personal needs and purposes, or, in other words, was Mrs. Hartz to be limited to the amount of *her* financial loss. (2) What part is to be played by the fact that an annual income of $65,000 would ordinarily be reduced by the payment of federal and state income taxes in a very substantial amount?

As to the first point, the plaintiff points to the state law, under which, admittedly, the Georgia courts do not allow any deduction for decedent's living or other personal expenses. Section 105–1308 of the Georgia Code reads: "The full value of the life of the decedent, as shown by the evidence, is the full value of the life of the decedent without deduction for necessary or other personal expenses of the decedent had he lived."

In response, the government relies on the language of the Federal Tort Claims Act, which says: The United States "shall not be liable for interest prior to judgment or *for punitive damages.*" (Emphasis supplied).

■ The trial court did not state how the final figure of $600,000 was arrived at. This court has heretofore recognized, relative to the Georgia statute, that to the extent it permits recovery of more than the loss to the survivor it is punitive. See Har-Pen Truck Lines v. Mills, 5 Cir., 378 F.2d 705, 712. The Georgia Supreme Court has likewise characterized the statute; Savannah Electric Co. v. Bell, 124 Ga. 663, 669, 53 S.E. 109, 112. So, too, has the Georgia Court of Appeals, Collins y. McPherson, 91 Ga.App. 347, 85 S.E.2d 552, 555.

■ We conclude that, guided by the language of the Tort Claims Act, the trial court may well have given consideration to the available standard of living of the decedent and his family and made a substantial allowance for personal expenses of Mr. Hartz in fixing the final amount. We conclude that the federal statute requires that the trial court do so in such cases. See United States v. Becker, 9 Cir., 1967, 378 F.2d 319.

■ As to the matter of a reduction of the amount to be awarded because of the known fact that Mr. Hartz's income was subject to income taxes, we think it appropriate for the trial court also to have taken this into consideration. While not subject to anything like precise measurement, because, as we all know, rates vary from Congress to Congress, an income of some $65,000 per year is so substantially depleted by the takings of the tax gatherer, that we adopt a view expressed by the Court of Appeals for the Ninth Circuit in Furumizo v. United States, 9 Cir., 1967, 381 F.2d 965. There the court said: "It is reasonably certain that what would have been available would have been after-tax dollars, not pretax dollars * * * We think that, at the least, the court could take this fact into consideration, although it might not have erred if it had refused to do so. * * * " 381 F.2d 965, 971. Here, without objection, evidence was introduced showing substantial federal income tax payments made by Mr. Hartz for several of the years used to compute his average income. We conclude that it was appropriate for the trial court to have given consideration to this ingredient of the final figure which the Georgia courts find has many ingredients. See also O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578.

■ It has been frequently thought that in the ordinary jury-tried personal injury suit, it would introduce too many complicating factors to permit the ordinary defendant to seek a reduction of the potential claim against him by giving consideration to the matter of income taxes that would have been paid by the

decedent. This is understandable and we find no fault with the decisions that in personal injury actions *between private parties* no consideration need be given to the incidence of taxation. Here, however, we have, by statute, a judge-tried case in which there is no problem of articulating a difficult charge to the trial court to weigh this along with all the other factors where the proven income is very substantial, in arriving at a total figure of damages.

Being unable to account precisely for the final figure of $600,000 by the only figures that are contained in the record, it is, nevertheless, plain that the trial court had available in the record of the trial ample evidence, when we give effect to the two disputed factors discussed above, which prevents our deciding that the final determination of $600,000 was clearly erroneous.

As we have stated, there is to be a total recovery for the plaintiff-appellant for the full amount of $600,000. Likewise, the full amount of loss of Globe Indemnity Company in the sum of $17,000 is to be recovered by it.

The appeal of Mrs. Hartz as to comparative negligence is meritorious. The judgment in her favor is modified to that extent. Her appeal as to insufficiency of the total value of the decedent's life must fail.

The judgment in favor of Globe is modified to include its total proven loss.

The cross appeal of the United States is meritorious to the extent that it contends that the trial court, *in a federal tort claims act,* cannot award a judgment in excess of the injury suffered by the survivor, and to the extent that in a case involving proven annual income of this size, the trial court should give reasonable consideration to the incidence of federal income taxation in arriving at a final judgment. In other respects the cross appeal is without merit.

Affirmed in part and reversed in part; remanded for entry of judgments in conformity with this opinion.